# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **KATHERINE GARGES,** | : | **CIVIL ACTION** |
| *Plaintiff,* | : | |
| **v.** | : | |
| | : | |
| **The PEOPLE'S LIGHT &** | : | |
| **THEATRE, Co.,** *et al.,* | : | |
| *Defendants.* | : | **No. 09-2456** |

## M E M O R A N D U M

PRATTER, J.                                                    DECEMBER <u>17</u>, 2012

### INTRODUCTION

Katherine Garges, who is a lawyer and is proceeding *pro se* in this case, has sued her former employer, the People's Light & Theatre Company ("the Theatre"), alleging primarily that the Theatre discriminated and retaliated against her in violation of Title VII of the Civil Rights Act of 1964, the Equal Pay Act of 1963 and the Fair Labor Standards Act of 1938. Ms. Garges's Complaint also sets forth a host of state law claims against the Theatre and against three of her former co-workers, one of whom was her supervisor.

Previously, the Defendants successfully moved to dismiss five of Ms. Garges's tort claims: assault and battery, ratification of assault and battery, negligent hiring, negligent supervision claims, and intentional infliction of emotional distress; Ms. Garges also voluntarily withdrew all claims based upon the Pennsylvania Equal Rights Amendment. Now Defendants have moved for summary judgment as to all of Ms. Garges's remaining claims.[1] For the reasons set forth below, Defendants' Motion will be granted as to Plaintiff's federal claims, and the Court declines to exercise supplemental jurisdiction over the remaining state claims.

---

[1]     The parties have also filed various motions *in limine* to exclude certain evidence at trial. These motions have no bearing on the disposition of the motion for summary judgment.

Ms. Garges joined the Theatre in 2002 as a telemarketer.  At the beginning of her employment, Ms. Garges signed a Sales Pay Plan that set hourly pay rates based on weekly sales and required that telemarketers work at least twelve hours per week or suffer a pay penalty. From 2002 through 2006, she and all of the telemarketers were supervised by Sales Director Alexis Cogan.  Ms. Cogan's employment with the Theatre ended in March 2006.  A year later, in March 2007, Adria Charles was hired as the new Sales Director.  Throughout the time Ms. Garges worked at the Theatre, the telemarketing department was very competitive internally and had a high rate of turnover.  The Theatre was perpetually seeking new telemarketers. Reportedly, casual profanity was a regular part of the work environment in the department; both male and female employees used profanity, including, on occasion, Ms. Garges herself.

## A.    Defendants Clemens and Echlin

Ms. Garges points to two men, John David Clemens and Terence Echlin, who she contends created a hostile work environment and were treated more favorably than she was. Shortly after Ms. Cogan left the Theatre, Mr. Clemens started yelling the word "bitch" after hanging up from sales calls.  When Ms. Garges confronted him about it, he claimed that he was not directing it at anyone in the room, but rather was only expressing his frustration towards a potential patron who refused to buy from him.  Mr. Clemens continued this habit, including during the time when Ms. Charles began working at the Theatre.[2]  Ms. Garges did not complain to Ms. Charles or any other manager or supervisor at the Theatre about Mr. Clemens's conduct, but she did complain to Mr. Clemens about his use of the word "bitch" "from time to time" when

---

[2]        At some point during the time period between Ms. Cogan's departure and Ms. Charles's arrival, Mr. Clemens took an extended leave of absence from his job at the Theatre, returning to work on April 2, 2007.

2

Ms. Charles was present, and Ms. Charles would tell Mr. Clemens to stop disturbing the other telemarketers.  Mr. Clemens also asked Ms. Garges once if she liked to be "on top;" a manager may have been present at the time this was said, but Ms. Garges has not presented evidence that she complained to the manager about the comment or that the manager, if any, overheard the comment.

Mr. Clemens and Mr. Echlin also made negative comments within Ms. Garges's hearing about women, pregnant women, and women's rights.  Mr. Echlin annoyed Ms. Garges by humming.  The two heckled Ms. Garges, particularly when she was attempting to speak with Ms. Charles about work issues.  Ms. Garges did not complain to any managers about any of this conduct.  The heckling, however, did sometimes occur when Ms. Charles was present.  At one point, Mr. Echlin also compared Ms. Garges to a former employee, Mary Kate Chorba, who had often appeared at work intoxicated and who was believed to have committed suicide.

Mr. Clemens sometimes made sales calls from home and sent emails to patrons using his personal email account, but he made the majority of his calls during work hours and his home activities were limited to when patrons specifically asked to be called during non-working hours.[3]  Ms. Garges never requested permission to work from home.  Rita Stern, a female employee, was allowed to work entirely from home under a pay arrangement that differed from the other telemarketers in the department.

Mr. Echlin sometimes managed telefunding campaigns.  During the time he managed those campaigns, he was allowed to distribute leads to himself.  He did not, however, have the

---

[3]     Ms. Garges counters that Mr. Clemens's home activities were "extensive," but does not cite to any record evidence supporting this or explain how what Mr. Clemens did at home would be a matter of which she could have personal knowledge or, for that matter, complaint.

authority to hire, fire, or discipline other employees.[4]  A female telemarketing employee, Mary Ritter, also occasionally managed telefunding campaigns and was allowed to distribute leads to herself while managing campaigns.

During Ms. Cogan's tenure as manager, she distributed renewal leads to the first person in the department who made a sale on a given evening, creating a snowball effect for that person. All of the department employees were eligible for this prize, but Mr. Clemens often had evenings' first sales.[5]  Mr. Echlin and Mr. Clemens were at some point given permission to work more hours per week, and Ms. Garges admits that when she asked to work more hours, she also received permission to do so.

Sometime in late 2005 or early 2006, Mr. Clemens had a "temper tantrum" after a discussion with Alexis Cogan when he was forced to return his premises key to the Theatre.  He was not terminated for his tantrum.

A few days before her termination, Ms. Garges discussed with Ms. Charles the unfair treatment she felt Mr. Clemens and Mr. Echlin had received under Ms. Cogan's leadership.

### B.    Payroll Issues

Occasionally, telemarketing employees at the Theatre experienced errors in their paychecks.  Both male and female employees experienced such errors.  According to Ms.

---

[4]    Ms. Garges contends that Mr. Echlin was a manager because he "led [her] to understand" that he hired employees for the campaigns he managed and let them go if they were not working out.  Aside from seeing Mr. Echlin interview and train new employees, Ms. Garges does not point to anything else that would suggest that he actually had the power to hire and/or fire other employees.  Moreover, Ms. Garges never states that Mr. Echlin actually told her he had authority to hire and fire, just that he "led [her] to understand" as much, which is simply an ambiguous statement, at best, and not enough to raise an issue of fact in light of both Mr. Echlin and Ms. Anderson's affidavits, which clearly state that Mr. Echlin never had that power.

[5]    Ms. Garges claims that this is because he made sales from home and then used those sales to appear to be the first person to get a sale on a given night.  Neither in her affidavit nor in her opposition to Defendants' statement of facts does she explain what evidence she has to support this belief.  She also does not present evidence that Ms. Cogan knew that Mr. Clemens did this.

Garges, if payroll errors are accounted for, she was the leading telemarketing sales person for the period of 2007 during which she was still employed at the Theatre.

###    C.    Ms. Garges's Termination and Aftermath

On the morning of July 5, 2007, Ms. Garges discovered a pay error amounting to around $250. She approached Stella Bates, the Theatre's Business Office Manager, about the error. That same morning, Ms. Bates provided Ms. Garges a check for the missing amount. After speaking with Ms. Bates, Ms. Garges returned to the telemarketing room, where Mr. Clemens and Mr. Echlin were working. She was upset about the error, so she left a message for Ms. Charles that explained that there had been an error in her pay, that she had been given a hard time about it, and that an employee whose pay is incorrect twice in the same payroll quarter can get a $500 fine from the employer. Ms. Garges also attempted to email Ms. Charles about it, but did not use the correct email address. She also emailed the Pennsylvania Department of Labor about the payroll errors and showed Ms. Bates a Pennsylvania wage statute.

After Mr. Echlin left the Theatre for the morning, he called Ms. Charles and informed her that Ms. Garges had been very disruptive in the telemarketing room that morning. When Ms. Garges arrived at the Theatre that evening for her shift, Ms. Charles was speaking with another employee. As soon as Ms. Charles finished that conversation, she told Ms. Garges she needed to speak with her immediately. Ms. Garges explained that she had a scheduled sales call at 6:00 p.m. and did not have time to speak with her at the moment. Ms. Charles continued to insist, and Ms. Garges stated, "I'll eat your ass if you want me to, but I have to make this phone call first." Ms. Garges also said that she had attempted to email Ms. Charles about the payroll error that day and did not want to spend any sales time on payroll errors. Ms. Charles then told Ms. Garges she

was fired,[6] to which Ms. Garges responded, "You can't fire me.  I quit."  Ms. Garges, however, immediately regretted her statement.  Ms. Charles again told Ms. Garges she was fired.  She then crossed the room and removed the phone receiver from Ms. Garges's hand.  According to Ms. Garges, Ms. Charles then assaulted her, hitting her repeatedly.[7]

Ms. Garges still would not leave the Theatre, so Ms. Charles left to find her supervisor, Ellen Anderson.  While she was gone, Ms. Garges continued to make sales calls; she also left the room to try to find Ms. Charles, and, not finding her, returned to her desk.  Ms. Charles then returned with Ms. Anderson and another employee, Jace Blue.  Ms. Anderson told Ms. Garges to leave and that she was terminated, but Ms. Garges continued to refuse and asked to speak with Ms. Anderson about her encounter with Ms. Charles.  Eventually, Mr. Blue called the police, who arrived and escorted Ms. Garges out of the building, even though Ms. Garges agreed to leave voluntarily at that point.  Ms. Garges did not tell the police at that time that Ms. Charles had assaulted her.  After Ms. Garges left, Ms. Charles distributed Ms. Garges's leads to other telemarketers in the department.

A former employee, John Hopkins, a male, was at the Theatre on the night of July 5, 2007 to speak with Ms. Charles about returning to work at the Theatre.  He was hired that evening.  Between early April, when Mr. Clemens returned to work at the Theatre, and Ms. Garges's termination, eight telemarketing employees were hired, five of whom were women.

---

[6]     Ms. Charles's version of events is slightly different, in that she claims to have initially simply told Ms. Garges that she was in no condition to make calls and that she should leave for the night.  Because the Court must draw all inferences in favor of Ms. Garges, this Memorandum presents the facts according to Ms. Garges's version of that evening's events.

[7]     Ms. Charles and other witnesses present on that evening state that Ms. Charles never made physical contact with Ms. Garges, but, again, for summary judgment purposes, the Court accepts the facts in the light most favorable to Ms. Garges, the non-moving party, for present purposes.

Within a month after Ms. Garges's termination, three more telemarketers were hired, including one woman.

After her termination, Ms. Garges filed for unemployment compensation, noting that she had been involuntarily terminated. After providing additional information, her claim was initially denied. She then appealed the denial, and a hearing was held on September 7, 2007. No one from the Theatre attended the appeal hearing, and Ms. Garges's appeal was granted. The Theatre contends that it only submitted information verifying Ms. Garges's statements about her wages. Ms. Garges claimed that at the hearing, she saw a document that the Theatre had submitted in opposition to her claim, but does not have a copy of that document.[8]

On November 8, 2007, the Theatre received a letter notifying it of Ms. Garges's discrimination claim. As early as August, 2007, Ms. Garges informed Ms. Anderson that she intended to file "complaint(s)" against the Theatre. At that time, however, Ms. Garges did not in any way specify what type of complaints she intended to file, except that they related to her termination. These communications took place after the initial denial of Ms. Garges's unemployment benefits.

## Legal Standards

Upon motion of a party, summary judgment in a federal case is appropriate if, "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, . . . admissions, interrogatory answers, or other materials," the moving party persuades the district court that "there is no genuine dispute as

---

[8]     Ms. Garges claims that the document in question contained an admission that Ms. Charles had grabbed her wrist, as well as "false" information about the events surrounding her termination. The initial August 8, 2007 decision regarding Ms. Garges's unemployment states, "The Employer reports the language used by the Claimant is used by co-workers but not directed at a supervisor." This suggests that the Theatre did provide information beyond simply a verification of wages; however, any such information must have been provided prior to August 8, 2007.

to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a), (c); *Miller v. Ind. Hosp.*, 843 F.2d 139, 143 (3d Cir. 1988).

In evaluating a summary judgment motion, the court "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor. *Hugh v. Butler Cty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005). If, after making all reasonable inferences in favor of the non-moving party, the court determines that there is no genuine issue of material fact, summary judgment is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 217, 322 (1986); *Wisniewski v. Johns-Manville Corp.*, 812 F.2d 81, 83 (3d Cir. 1987).

The party opposing summary judgment must support each essential element of that party's opposition by "citing to particular parts of materials in the record." Fed R. Civ. P. 56(c)(1). "The Court need consider only the cited materials" when determining whether there exists a genuine issue of material fact for trial. Fed R. Civ. P. 56(c)(3). If the cited evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (citations omitted). This requirement upholds the "underlying purpose of summary judgment [which] is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense." *Walden v. Saint Goban Corp.*, 323 F. Supp. 2d 637, 641 (E.D. Pa. 2004) (citing *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976)).

**DISCUSSION**

A.    **Evidentiary Issues**

As an initial matter, Ms. Garges claims that three of the Defendants' affidavits, those of Ms. Charles, Mr. Echlin, and Ms. Anderson, should be ignored because they contradict to some

extent admissions in the Theatre's Answer. The so-called contradictions, however, are not actually contradictions. Ms. Garges claims that while the Answer states that Ms. Charles fired her and John Hopkins's first day back at the Theatre was July 5, 2007, the affidavits state that Ms. Anderson was responsible for her termination and John Hopkins came in on July 5, 2007 for an interview. However, the admission in Defendants' Answer was that Ms. Charles told Ms. Garges she was fired, which does not contradict the statement that Ms. Anderson also told her that she was fired. As to Mr. Hopkins, Defendants explain that he both came in for an interview and was hired on July 5, 2007.

Ms. Garges also argues that all of the affidavits are defective, in that they state that they are based on "information and belief" as well as knowledge. However, the affidavits state that the affiants aver that the statements therein are true based on their "knowledge, information, *and* belief," and there is nothing about the statements that would lead the Court to conclude that they were based on anything outside the affiants' personal knowledge, *i.e.*, that they were *only* based on information or belief. Therefore, the Court will consider the affidavits, together with the rest of the parties' submitted evidence.

Ms. Garges also objects to Defendants' Exhibits I and S, which she claims are inaccurate earnings spreadsheets. Ms. Garges submits evidence which she claims accurately reflect her own earnings. As to the earnings of her co-workers, however, she only submits a handful of payroll statements for individual weeks, and these statements appear to be consistent with Exhibits I and S. Whether these spreadsheets are accurate or not, the burden is on Ms. Garges to produce evidence supporting her claims at this stage of the case.

Finally, Ms. Garges argues that due to her impecunious financial situation, she was unable to obtain certain information or to take depositions. She asks that the Court defer decision on this motion pursuant to Federal Rule of Civil Procedure 56(d). She does not explain, however, how deferring a decision will enable her to muster the resources to take depositions, or why the Court should even permit additional discovery well after the discovery deadline in this case has passed. Moreover, although the Court recognizes that Ms. Garges has *in forma pauperis* status, "[t]here is no provision in [28 U.S.C. § 1915] for the payment by the government of the costs of deposition transcripts, or any other litigation expenses, and no other statute authorizes courts to commit federal monies for payment of the necessary expenses in a civil suit brought by an indigent litigant." *Tabron v. Grace*, 6 F.3d 147, 159 (3d Cir. 1993). Also of note is that Defendants provided Ms. Garges with contact information for a host of potential fact witnesses, whom Ms. Garges was free to contact and interview without necessarily incurring the expense of a deposition. For all of these reasons, then, the Court will not postpone ruling on the instant motion.

### B. Title VII Gender Discrimination

Several of Ms. Garges's claims purport to invoke Title VII of the Civil Rights Act of 1968. Claims 1, 3, 5, and 13 of Ms. Garges's Second Amendment to Complaint ("Second Amended Complaint") charge the Theatre with violating Title VII by terminating her or otherwise treating her differently because of her gender. To establish a *prima facie* case of discrimination under Title VII, a plaintiff must show that (1) she belongs to a protected class, (2) she was qualified for the position, (3) she was subject to an adverse employment action, and (4) the adverse action occurred under circumstances that raise an inference of discriminatory action.

*Serullo v. United States Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003).  If a plaintiff can set forth a *prima facie* case, the defendant then must proffer a legitimate, non-discriminatory reason for the adverse action.  Faced with a legitimate, non-discriminatory reason, a plaintiff then bears the burden of showing that the stated defense reason is a mere pretext for discrimination, because she has introduced evidence that would lead a jury to either disbelieve the defendant's reason or believe that discrimination was more likely than not a motivating or determining cause of the adverse action.  *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994).

Counts 1, 3, and 5 all relate to Ms. Garges's termination.  In those counts, she alleges that she was terminated because of her gender because (1) Mr. Clemens, a male, was not terminated for frequently using the word "bitch" in the workplace or for throwing a temper tantrum,[9] while Ms. Garges was terminated for using profanity on one occasion; (2) either Mr. Hopkins or Mr. Clemens, both males, were hired to replace her; (3) her leads were redistributed to other employees, including males Mr. Clemens and Mr. Echlin who, due to their experience, were most likely to capitalize on them; and (4) if Mr. Clemens or Mr. Echlin had made payroll complaints, they would not have been terminated.

Defendants argue that even if Ms. Garges had set forth a *prima facie* case of discrimination, she cannot point to any evidence that would overcome the Theatre's legitimate, non-discriminatory reason for terminating her, *i.e.*, inappropriate and insubordinate behavior on the night of July 5, 2007.  The Theatre points to Ms. Garges's obdurate refusal to comply with Ms. Charles's request, her argumentative response "I will eat your ass if you want me to, but I have to make this phone call first," and her continued refusal to leave the premises even after Ms. Anderson became involved in the situation and which necessitated calling the police.

---

[9]     Ms. Garges did not specifically include this allegation in Count 1 of her Second Amended Complaint; however, she discusses this in her opposition papers and in the affidavit attached thereto.

Ms. Garges focuses almost exclusively on the use of profanity as the Theatre's proffered reason for her termination, noting that although profanity was frequently used in the department, no one else was ever fired for using it. In so doing, she misses the crucial distinction between her conduct and the conduct of others – not only did she direct her profanity (either voluntarily or involuntarily) at her supervisor, but she did so while at the same time repeatedly refusing to obey her supervisor's clear directives. To the extent Ms. Garges relies on a comparison between her behavior on that night and Mr. Clemens's behavior in using the word "bitch," the two types of conduct are not sufficiently similar to raise an inference of discrimination that would upset the Theatre's proffered explanation for Ms. Garges's termination. While Mr. Clemens's behavior could be characterized as disruptive and even offensive, he did not overtly direct his comments at a superior.[10] Ms. Garges, on the other hand, directed her comment specifically to her supervisor *and* repeatedly refused to comply with direct orders from her supervisors.

Likewise, to the extent Ms. Garges compares her actions to Mr. Clemens's with respect to his "temper tantrum" when he was told to turn in his key, Mr. Clemens is not similarly situated vis à vis Ms. Garges. For starters, Ms. Garges provides no details on this "temper tantrum," and there is no competent evidence that Mr. Clemens repeatedly refused to obey a supervisor's directive. Thus, it is not possible to tell whether Mr. Clemens's behavior truly resembled Ms. Garges's. Moreover, a different supervisor was involved in the incident involving Mr. Clemens. *See Wynn-Mason v. Levas Communications, LLC*, Civ. A. No. 09-1235, 2011 WL 1599238, at *9 (E.D. Pa. Apr. 28, 2011) (noting that "'[d]ifferent employment decisions, concerning different employees, made by different supervisors, are seldom sufficiently comparable to establish a prima facie case of discrimination for the simple reason that different

---

[10]    Ms. Garges claims there is an issue of fact as to whether Mr. Clemens was directing his comments at Ms. Charles, but points to no actual evidence to support this contention.

supervisors may exercise their discretion differently'" (quoting *Radue v. Kimberly–Clark Corp.,* 219 F.3d 612, 618 (7th Cir. 2000))).

As for the re-hiring of Mr. Hopkins and Mr. Clemens, these events are not sufficient to allow a jury to conclude that the Theatre's reason for terminating Ms. Garges was mere pretext. From the time Mr. Clemens was rehired in April 2007 through the beginning of August 2007 (one month after Ms. Garges was terminated), eleven new telemarketing employees were hired, six of whom were women. Ms. Garges has presented no evidence to demonstrate that either Mr. Hopkins or Mr. Clemens were specifically hired as her replacement. She has not shown, for instance, that any single new employee took over all of her leads, was hired to work the very same shifts that she used to work, or anything else that might tend to show that a specific person was hired to replace her.

As to the redistribution of her leads, Ms. Garges contends that because Messrs. Echlin, Clemens, and Hopkins were among those who received her leads[11] and because, as experienced telemarketers, Mr. Clemens and Mr. Echlin were most likely to be able to capitalize on the additional leads, a jury could infer that she was terminated in order to benefit these male employees. Once again, Ms. Garges's subjective beliefs are not supported by any record evidence connecting this redistribution of leads with Ms. Garges's gender. Even assuming this fact would be enough to satisfy Ms. Garges's burden to set forth a *prima facie* case, it is not sufficient to overcome the Theatre's legitimate, nondiscriminatory reason for terminating her, either by casting doubt on the Theatre's proffered explanation or by showing that Ms. Garges's gender was more likely than not a motivating cause for the Theatre's actions.

---

[11]     Other employees who were there on the evening of Ms. Garges's termination and who received her leads included Emma Peabody and Chris Robertson.

Ms. Garges's next argument, that she was fired for making a payroll complaint and that neither Mr. Echlin nor Mr. Clemens would have been fired had they done the same, relies on rank speculation. Ms. Garges acknowledges that neither of those men ever made a payroll complaint, in part because, according to Ms. Garges, Mr. Echlin never paid enough attention to his paycheck to know whether it was correct or not. Moreover, Ms. Garges points to only one other example of someone who made a payroll complaint – a female employee, Kate Woodward, who, according to Ms. Garges, created a much bigger fuss than she did. Ms. Woodward, however, was not terminated. Thus, even if her termination did have anything to do with her payroll complaints, Ms. Garges has presented no evidence that a similarly situated male employee was not fired for the same conduct and, indeed, has presented evidence that casts significant doubt on Ms. Garges's theory that her payroll complaint had anything to do with her termination.

Apart from her termination, Ms. Garges also contends that the Theatre discriminated against her based on her gender in the terms and conditions of her employment. For instance, she claims that (1) Mr. Clemens, a male employee, was allowed to do substantial work from home; (2) Mr. Clemens requested a change in the hours telemarketers could work on Saturday, and the request was granted, affecting all the telemarketers; (3) Mr. Clemens and Mr. Echlin received better sales leads; (4) Mr. Clemens and Mr. Echlin were permitted to work more hours than she was; and (5) Mr. Clemens and Mr. Echlin received notice of changes in departmental rules before she did.

Ms. Garges cannot set out a *prima facie* case for these complaints. To set forth a *prima facie* case, a plaintiff must, among other things, put forth some evidence that would raise an

inference of discrimination.  As noted above, Ms. Garges has not only provided no evidence regarding the volume of work Mr. Clemens did from home, but she also has not shown that, regardless of the volume of work he did at home, he is even a similarly situated employee for purposes of raising an inference of discrimination, in that she admits that she never asked to work from home.  Likewise, as to Mr. Clemens's request for different Saturday hours and Mr. Clemens's and Mr. Echlin's extra hours, Ms. Garges admits that she never made a similar request with respect to shift hours and that when she asked to work extra hours she was allowed to do so.  Thus, her assertions that their "privileges" constituted gender-based discrimination are nothing more than speculation.

Ms. Garges argues that Mr. Clemens and Mr. Echlin received better sales leads than she did.  She has proffered no evidence to support this, beyond arguing that Mr. Clemens often won contests for renewal leads and Mr. Echlin was allowed to distribute leads to himself when managing a telefunding campaign.  Ms. Garges presents no evidence that Mr. Clemens won these contests because he was a man or that women who won the contest did not receive renewal leads.  While it is true that Mr. Echlin did distribute leads to himself while managing a telefunding campaign, so did Mary Ritter, a female employee who also managed a telefunding campaign.  Again, then, Ms. Garges presents no facts raising an inference of gender discrimination.

The only evidence that Ms. Garges provides regarding Mr. Clemens and Mr. Echlin learning about new changes in departmental policy before she did is that, shortly before she was terminated, she heard them discussing with Ms. Charles the elimination of the commission cap. She presents no evidence regarding how much sooner they learned of this new policy than she

did or when it was actually going to be implemented, nor does she assert that only those who knew of the changes would be eligible to benefit from them. Thus, Ms. Garges has not only failed to provide evidence supporting an inference of discrimination with regard to this supposed issue, but she also has failed to show that Mr. Clemens's and Mr. Echlin's slightly earlier knowledge of new policy actually constituted an adverse employment action.

For the foregoing reasons, then, Counts 1, 3, 5, and 13 of Ms. Garges's Second Amended Complaint are dismissed.

### C.     Title VII Hostile Work Environment

In Count 11, Ms. Garges claims that she was subjected to a hostile work environment in violation of Title VII. Five elements must be proved to bring a successful claim for a sexually discriminatory hostile work environment: (1) the employee suffered intentional discrimination because of her gender; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected the employee; (4) the discrimination would have detrimentally affected a reasonable person in like circumstances; and (5) a basis for employer liability is present. *Jensen v. Potter,* 435 F.3d 444, 449 (3d Cir. 2006).

A plaintiff's hostile work environment claim will survive summary judgment if she "presents sufficient evidence to give rise to an inference of discrimination by offering proof that her 'workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment' . . . and the conduct is based on one of the categories protected under Title VII." *Abramson v. William Paterson Coll. of N.J.,* 260 F.3d 265, 279 (3d Cir. 2001)

(quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993)); *see also Weston v. Penna.*, 251 F.3d 420, 426 (3d. Cir. 2003).

The Supreme Court has cautioned that a court must look at the totality of the circumstances when judging whether a work environment is hostile. *Harris,* 510 U.S. at 23. The Third Circuit Court of Appeals has stated that "courts should not consider each incident of harassment in isolation. Rather, a court must evaluate the sum total of abuse over time." *Durham Life Ins. Co. v. Evans,* 166 F.3d 139, 155 (3d Cir. 1999) (internal citations omitted). A court must evaluate the record

> as a whole to decide whether the plaintiff has proved his or her case, because "[p]articularly in the discrimination area, it is often difficult to determine the motivations of an action and any analysis is filled with pitfalls and ambiguities .... [A] discrimination analysis must concentrate not on individual incidents, but on the overall scenario."

*Cardenas v. Massey*, 269 F.3d 251, 261 (3d Cir. 2001) (quoting *Durham,* 166 F.3d at 149) (alterations in original). In order to determine whether conduct is severe or pervasive enough that it would support a hostile work environment claim, courts look at several factors, including "[(1)] the frequency of the discriminatory conduct; [(2)] its severity; [(3)] whether it is physically threatening or humiliating, or a mere offensive utterance; . . . [(4)] whether it unreasonably interferes with an employee's work performance . . . [; and (5) the] effect on the employee's psychological well-being." *Harris v. Forklift Systems, Inc*., 510 U.S. 17, 23 (1993).

The conduct identified by Ms. Garges as creating this environment centers on the actions of Mr. Clemens and Mr. Echlin. Mr. Clemens made an arguably sexual remark when he asked Ms. Garges if she preferred to be "on top." He also yelled out the word "bitch" after hanging up the phone. Mr. Clemens and Mr. Echlin both made negative comments within Ms. Garges's hearing about women, pregnant women, and women's rights. Mr. Echlin annoyed her by

humming. The two heckled Ms. Garges, particularly when she was attempting to speak with Ms. Charles about work issues. At one point, Mr. Echlin also compared Ms. Garges to a former employee, Mary Kate Chorba, who had often appeared at work intoxicated and who had, reportedly, committed suicide. While the Court must look at the totality of the circumstances, it would appear at the outset that only a few of these categories of behavior have any connection to Ms. Garges's gender. Indeed, Ms. Garges herself attributes at least some of the conduct to the competitiveness of her two co-workers, given that her sales were steadily improving in the weeks leading up to her termination.

As an initial matter, Ms. Garges has provided insufficient details for the Court to determine how frequently Mr. Clemens and Mr. Echlin engaged in much of the listed behavior or, in at least some instances, to determine the precise nature of the comments. It is reasonably clear that at least some of the examples were one-time comments (e.g., the sexual remark by Mr. Clemens and the comparison drawn by Mr. Echlin between Ms. Garges and Ms. Chorba). However, nowhere in her affidavits or other proffered evidence does Ms. Garges attempt to quantify how often Mr. Clemens yelled "bitch,"[12] or how frequently the two made disparaging remarks about women, or how many times they heckled her. In her deposition, Ms. Garges testified that Mr. Clemens screamed the word "bitch" "a lot." In his affidavit, Mr. Clemens avers that he "sometimes" used that word and other off-color expletives after hanging up with rude customers. Ms. Charles states that Mr. Clemens "occasionally" said the word "bitch" after

---

[12]    In her Second Amended Complaint, she alleges that Mr. Clemens used profanity 5 to 10 times an hour. She does not present any actual evidence of that, either through deposition testimony or by affidavit, and even in her Second Amended Complaint, she does not say how often she and Mr. Clemens worked together, or whether he used profanity 5 to 10 times per hour during every hour they worked together. Indeed, at her deposition, she admitted that there were at least some days when Mr. Clemens did not use the word "bitch" at all.

hanging up.  Emma Peabody, another telemarketing employee, did not recall Mr. Clemens using the word "bitch."

As for the negative comments on women, pregnant women, and women's rights, Ms. Garges simply states that Mr. Clemens and Mr. Echlin discussed these topics "often."  She provides no evidence as to the substance of the comments, but rather simply provides a very general description from which the Court cannot discern the actual nature of the comments without undue speculation.  Ms. Garges likewise only vaguely describes the "heckling" as Mr. Echlin and Mr. Clemens trying to stop her from speaking to Ms. Charles about payroll issues, and although she states that it increased in the weeks before her termination, she gives the Court no meaningful way to discern what she means by "increased."

Looking at the factors outlined in *Harris*, the frequency of the conduct, as noted above, is unclear, as Ms. Garges has not presented much in the way of specific evidence with respect to that factor.  Even when viewing the conduct as a whole, it is difficult for the Court to say that the harassment was at all severe.  Ms. Garges never avers that she felt physically threatened by Mr. Clemens or Mr. Echlin, nor does she go so far as to describe the conduct as humiliating – at her deposition, she described much of the conduct as "annoying" and "disruptive."  As to her work performance and psychological well-being, Ms. Garges claims on the one hand that the harassment was a detriment to her performance and on the other hand asserts that she was the highest earning sales person at the time when the harassment reached its peak.

Weighing all these factors, Ms. Garges simply has not presented sufficient evidence to allow the Court to conclude that a reasonable jury could find that the harassment was severe or pervasive enough to create a hostile work environment actionable under Title VII.  *See*

*Grassmyer v. Shred-It USA, Inc.*, 392 Fed. Appx. 18, 29-30 (3d Cir. 2010) (affirming summary judgment on hostile work environment claim when plaintiffs' supervisor regularly made sexually explicit comments, referred to women as "bitches," played a CD with sexually explicit lyrics, and otherwise used inappropriate language, even when that conduct was combined with other evidence of unequal treatment). Accordingly, the Court with grant Defendants' motion as to this count.

> **D.     Title VII Retaliation**

In Count 7 of her Second Amended Complaint, Ms. Garges claims that she was fired in retaliation for complaining about preferential treatment of Messrs. Clemens and Echlin, for pointing out that male employees did not have to deal with paycheck errors, and for objecting to Mr. Clemens's use of profanity. "To establish a *prima facie* case of retaliation under Title VII, a plaintiff must tender evidence that: (1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action." *Moore v. City of Philadelphia*, 461 F.3d 331, 340 -341 (3d Cir. 2006) (internal quotation omitted).

As to Ms. Garges's first theory, that she was retaliated against for complaining of preferential treatment received by two male colleagues, the Third Circuit Court of Appeals has made clear that general complaints of unfair treatment cannot support a retaliation claim – the complaint must include some mention of a protected class or conduct to serve as the basis for such a claim. *See, e.g., Barber v. CSX Distribution Servs.*, 68 F.3d 694 (3d Cir. 1995). Ms. Garges has presented no evidence that she invoked gender in any way in making her complaints to Ms. Charles about the perceived unfair treatment. Moreover, making a causal connection

between these complaints and her termination would be exceedingly difficult, at best – Ms. Garges complained to Ms. Charles about preferential treatment received by other employees under a different supervisor, and, by her own admission, that particular preferential treatment was no longer a part of the Theatre workplace.

As to her complaints about payroll errors, although her Second Amended Complaint states that she complained that men did not experience payroll errors, in her deposition, she stated that although she believed that Mr. Clemens and Mr. Echlin did not experience errors, she was sure that other male employees did experience such errors. Her affidavit in support of her claims seems to support that it was only Mr. Clemens and Mr. Echlin who she was claiming did not experience payroll errors. Once again, there is no evidence that when she complained to Ms. Charles she actually broached the topic of gender discrimination, rather than merely complaining of perceived unequal treatment between herself and other employees who happened to be men.

Finally, as to her objections to Mr. Clemens's use of profanity, Ms. Garges admits that she never actually complained to a supervisor about this – at most, she claims that she objected to Mr. Clemens's language while a supervisor was also in the same room. Without an actual complaint, Ms. Garges cannot be said to have engaged in any protected activity.

In Count 25 of her Second Amended Complaint, Ms. Garges contends that the Theatre retaliated against her for making complaints about gender discrimination and/or payroll issues by opposing her claim for unemployment compensation. First, as noted above, Ms. Garges cannot show that the Theatre's reason for terminating her was a mere pretext, so to the extent that she attempts to once again raise this argument in the context of this claim, the claim must fail. Moreover, even if Ms. Garges could prove that the Theatre opposed her claim for unemployment

benefits, she has not provided any link between that opposition and her complaints of discrimination. The Theatre was not officially notified of her discrimination claims until November 8, 2007, well after the unemployment compensation appeal hearing, and emails she exchanged with Theatre personnel discussing the impending filing of "complaint(s)" against the Theatre, which she argues show that the Theatre knew earlier, were still sent *after* the Theatre's alleged opposition to her unemployment claim – indeed, those emails center on Ms. Garges's accusations of opposition to the claim. Ms. Garges has not shown that the Theatre submitted anything to the unemployment bureau after its initial denial and before her appeal hearing, and, at any rate, since she won her appeal, any opposition during that time period did not actually cause her harm.

For all of these reasons, then, Ms. Garges's Title VII retaliation claims must fail.

### E. Title VII Mixed Motive

In Count 9 of her Second Amended Complaint, Ms. Garges asserts that, in the alternative, the Theatre terminated her employment based on "mixed motives." The "mixed motives" analysis established by the Supreme Court in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 258 (1989), as modified by section 107 of the Civil Rights Act of 1991, 42 U.S.C. § 2000e-2(m), is appropriate when a plaintiff presents direct evidence of discrimination. Under the modified *Price Waterhouse* standard, a defendant is liable for discrimination upon proof that a forbidden criterion "was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m). Once a plaintiff shows that there is a genuine issue of material fact as to whether discrimination was a motivating factor for an employment practice, the burden of production and persuasion shift to the defendant, and summary judgment

should ordinarily be denied.  *See Hankins v. City of Philadelphia,* 189 F.3d 353, 368 n. 8 (3d Cir. 1999); *see also Martinez v. Fox Broad., Co.,* No. 06-04537, 2008 WL 4425099, at *3 (E.D. Pa. Sept. 30, 2008) ("If a plaintiff shows direct evidence of discrimination, he need not demonstrate anything further in order to survive summary judgment.").

A plaintiff attempting to prove discrimination with direct evidence faces a "high hurdle." *Walden v. Georgia-Pacific Corp.,* 126 F.3d 506, 513 (3d Cir. 1997). The direct evidence must demonstrate that the "decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision." *See Price Waterhouse,* 490 U.S. at 277, 109 S.Ct. 1775 (O'Connor, J., concurring).  Derogatory comments or stray remarks in the workplace that are unrelated to employment decisions, even when uttered by decision makers, do not constitute direct evidence of discrimination. *Id.; see also Fuentes v. Perskie,* 32 F.3d 759, 767 (3d Cir. 1994) ("Stray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision") (internal quotation and citation omitted).

Here, Ms. Garges has presented no direct evidence of gender discrimination – not even a stray remark by a decisionmaker.  Thus, to the extent she pleads in the alternative under a mixed motive theory, her claim must be dismissed.

F.     **Equal Pay Act**

In Count 15 of her Second Amended Complaint, Ms. Garges claims that she received unequal compensation as compared to Messrs. Clemens and Echlin in violation of the Equal Pay Act.  The test for Equal Pay Act claims differs from the familiar *McDonnell Douglas* framework applied in Title VII cases.  Under the EPA, first a plaintiff must demonstrate that employees of

the opposite sex were paid differently for performing "work of substantially equal skill, effort and responsibility, under similar working conditions." *Stanziale v. Jargowsky*, 200 F.3d 101, 107 (3d Cir. 2000). The burden of persuasion, rather than merely of production, then shifts to the employer, who may avoid liability by establishing one of the four affirmative defenses enumerated under the EPA: "(i) a bona fide seniority system, (ii) a merit system, (iii) a system which measures earnings by quantity or quality of production, or (iv) a differential based on any factor other than sex." 29 U.S.C. § 206(d)(1); *see also Stanziale*, 200 F.3d at 107, 107n.6. Unlike under Title VII, "[i]t is not enough that the employer's proffered reasons could explain the wage disparity; the proffered reasons must in fact explain the wage disparity." *Rowland v. Certainteed Corp.*, Civ. A. No. 08-3671, 2009 WL 1444413, at *8 (E.D. Pa. May 21, 2009) (citing *Stanziale*, 200 F.3d at 108).

Aside from a subjective belief that Messrs. Clemens and Echlin were paid more than she was for equal work because they are male, Ms. Garges submits no actual evidence that this was the case. She admits that all employees were paid based on the same commission formulaic arrangement. She has not explained how this commission-based system was discriminatory or favored male employees over female employees. Indeed, payroll records show that in 2007 up to the time of Ms. Garges's termination, while the top two earners were male, the remaining eight of the top ten earners were female. Moreover, looking at the evidence in the light most favorable to Ms. Garges, if payroll errors are factored in, she was actually the top earner for this time period. Ms. Garges does point to specific weeks during which she earned less than male employees, but she does not also show that she performed equal work (i.e., completed the same number of sales, sales calls, etc.) for those weeks. Finally, to the extent this claim is based on

Ms. Garges's contention that Messrs. Clemens and Echlin received better sales leads as a result of gender discrimination, that argument has been disposed of in the discussion of her Title VII claims. *See* Section B, *supra*. Therefore, Ms. Garges's Equal Pay Act claim must fail.

### G. Equal Pay Act/FLSA Retaliation

In Count 18 of the Second Amended Complaint, Ms. Garges alleges that the Theatre terminated her in retaliation for her payroll complaints, in violation of the Equal Pay Act and the FLSA. The standard for such a claim is the same as for her Title VII retaliation claims, discussed in Section D, *supra*. Ms. Garges relies on the temporal proximity between her termination and four events: her question to Ms. Charles about missing hours and hourly rates on some pay stubs, her request of a new procedure to avoid payroll errors, her discussion of Pennsylvania wage laws with Ms. Bates, and her communication with the Pennsylvania Department of Labor. Ms. Garges does not explain how any of these activities are protected under the FLSA or the EPA. The FLSA deals with minimum wage, overtime pay, and child labor. It does not bear any relation to the type of payroll errors of which Ms. Garges complained.[13] Similarly, Ms. Garges does not mention making any complaints of gender discrimination in pay in the four events she cites as evidence for this claim, so there is nothing to implicate the Equal Pay Act. Therefore, without any evidence that Ms. Garges engaged in any activities protected by the federal statutes she cites, she cannot set forth a *prima facie* case of retaliation, and her claim must be dismissed.

---

[13] To the extent Ms. Garges's complaint about missing hours and hourly rates could possibly be construed as protected activity covered by the FLSA, her claim must still fail because she cannot show that the Theatre's legitimate, non-discriminatory reason for terminating her employment was merely a pretext for retaliation, just as she cannot show that it was a pretext for the other unlawful conduct she alleges. *See* Section B, *supra*.

### H.      State Law Claims

The remainder of Ms. Garges's claims rely exclusively on Pennsylvania state law. Because all of Ms. Garges's federal claims have now been dismissed before trial, the Court will exercise its discretion not to exercise supplemental jurisdiction over her remaining state law claims. *See* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a [pendant state law claim] if . . . the district court has dismissed all claims over which it has original jurisdiction[.]"). The Court notes that under the same statute, Ms. Garges may now be able bring these claims in state court, regardless of whether the statute of limitations on the claims ran during the pendency of this action (provided, or course, that the statute of limitations did not run before she initiated this action). *See* 28 U.S.C. § 1367(d) ("The period of limitations for any [pendant state law] claim [over which the Court exercised supplemental jurisdiction] . . . shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period.").

### CONCLUSION

For the foregoing reasons, the Court will grant Defendants' Motion for Summary Judgment as to Counts 1, 3, 5, 7, 9, 11, 13, 15, 18, and 25 of Plaintiff's Second Amended Complaint and decline to exercise supplemental jurisdiction over the remaining claims. An appropriate Order follows.

BY THE COURT:

  /s/  Gene E.K. Pratter
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE
